# IN RE THOMSON.

---

PATENTS; COMBINATION OF OLD ELEMENTS.

Although the commercial success of a device does not confer patentability upon it, and although a combination of old elements is not patentable, yet, where the question of novelty is in doubt, the fact that a new combination and arrangement of known elements produces a new and useful result, displacing other devices employed for a like purpose, is sufficient to turn the scale in favor of invention.

No. 318.  Patent Appeals.  Submitted November 24, 1905.  Decided January 4, 1906.

HEARING on an appeal from a decision of the Commissioner of Patents rejecting an application for a patent.    *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. F. P. Warfield, Mr. H. S. Duell, Mr. R. S. Blair,* and *Mr. A. S. Nathan* for the appellant.

*Mr. John M. Coit* for the Commissioner of Patents.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents rejecting an application for a patent for an improvement in lighting systems.

The consideration of the merits of the applicant's alleged novel combination was embarrassed, and possibly prejudiced, by the great number of claims presented and insisted upon throughout the proceedings in the Patent Office. On this appeal, the applicant, William I. Thomson, has abandoned all his twenty-one claims except the four following:

"3. In combination, a shunt-wound generator having serially included in its field circuit a plurality of contacting electrodes and positively acting electro-magnetic means controlled by the current output of the generator for varying the pressure with which said electrodes contact."

"13. In a car-axle lighting system, in combination, a dynamo adapted to be driven from a car axle, said dynamo having a single-field circuit shunt wound from the main circuit, a variable resistance device included in said field circuit, said device embodying a material whose resistance varies with pressure, a controlling device in series with the main circuit of the dynamo, said controlling device adapted to be operated by variations of current in said main circuit, and connections from said controlling device for varying the pressure on said resistance device."

"17. In a car-axle lighting system, in combination, a dynamo adapted to be driven from a car axle, said dynamo having a field circuit shunt wound from the main circuit, a series of carbon discs interposed in said field circuit, a controlling device adapted to be actuated by variations in current in the main cir-

cuit of the dynamo and in series therewith, a connection between said controlling device and said discs such that pressure on said discs is decreased as the current in the main circuit increases, and a spring acting upon said discs in opposition to said controlling device to increase the pressure thereon."

"20. In a car-axle lighting system, in combination, a dynamo adapted to be driven from a car axle, said dynamo having a field circuit shunt wound from the main circuit, a series of carbon discs included in said field circuit, a solenoid in series with the main circuit of the dynamo and independent of the field circuit, a connection between the plunger of said solenoid and said discs such that the pressure upon said discs is decreased as the current in the main circuit increases, and a spring adapted to act upon said discs to increase the pressure thereon in opposition to said solenoid."

In rejecting the series of claims, the tribunals of the Patent Office referred to a number of patents, the most important of which are: Weston, No. 292,715, of January 29, 1884; Moskowitz, No. 626,713, of June 13, 1899; and Creveling, No. 688,394, of December 10, 1901.

The object sought to be accomplished by the combination of the application is a practical and effective system of electrical lighting for railway cars, and there is no doubt of the great and urgent demand for such a system.

Two systems of electrical car lighting have heretofore been in use. In the first of these, cumbersome storage batteries have been used in the cars, which must be charged from time to time. This involves labor, loss of time, and expense, practically confining the use to comparatively short trips, and apparently preventing general adoption. The second system, which it seems has been as little used as the first, is operated by a generator driven from the locomotive. This involves a complicated system of connections rendering the installation and maintenance expensive and otherwise unsatisfactory. On account of these objections, systems of electrical car lighting have not gone into anything like general use on the principal railways of the country. The general conclusion of practical railway managers,

it seems, has been, that for practical use each car must be made
to generate its own current through the power furnished by its
own axles when in motion. In such a system the storage bat-
tery is a necessary accessory in order to maintain the light when
the car is at rest. The difficulty with such a system lies in the
variable speed of the cars through which the current is increased
or diminished, thereby seriously affecting the character of the
light furnished. The object of the invention, as claimed, is to
overcome this difficulty through a combination, the dominant
features of which consist in the character of variable resistance
device used as a means for controlling the shunt circuit of the
generator, and the relation of this variable resistance device to
the shunt circuit and to the current output of the dynamo.

Before the final hearing before the Commissioner, affidavits
were received and filed, showing that a full-sized apparatus, con-
structed in accordance with the specifications and claims of the
application, had been installed in a car on the New York Cen-
tral Railroad in October, 1904; and that said car had been run
daily, from that time until the date of the affidavits, between
New York and Troy, a distance of 300 miles. It was further
shown that, during the entire period, the apparatus had worked
in a satisfactory manner, completely demonstrating its practi-
cal efficiency.

The applicant does not claim the invention of any distinctly
new element, but a combination of elements which mutually
coact and interact to produce a new result,—not the mere sum of
the results of individual or separate use, but a result due to their
conjoint use, in the course of which they mutually affect one
another through their peculiar adaptation for use one with
another.

The tribunals of the Patent Office, while admitting the mani-
fest advantages of the applicant's combination system over
others, deny the claim aforesaid. Based on the references to
existing patents, their conclusion was, substantially, that the
various devices of the combination are old; that the resulting .
advantages are inherent in the several devices themselves; and

that their operation and value are matters of common knowledge, to be availed of by mechanical, electrical skill.

Their conclusion, however, is not made so clear to our minds by the discussion of the references as it appears to have been to their own.

The Weston patent, on which great stress is laid, shows an ordinary lighting system. Referring to this, the Examiners-in-Chief say of the applicant: "He created on new situation, except in the limited sense that he has applied carbon resistance to the old Weston system, which is practically identical with the applicant's system, except in the use of a different form of variable resistance."

We are not prepared to accept this view of the identity of the two systems as broadly stated. It is true that Weston, whose system was intended for a different use from that of the applicant, shows a shunt-wound generator with a variable resistance in its filled circuit, apparently designed to regulate the positions of the carbons of a series of arc lamps as illustrated by the drawings.

The resistance devices of the two systems are admitted to be different. There is, however, another important difference in that applicant's device, through pressure resistance in the shunt field of the generator, exercises control from or upon the main current or output of the dynamo which is essential to the successful operation of his system.

It was further said, in rejecting the application, that Creveling's system shows the features of the applicant's, except in respect of the particular type of the variable resistance; and would operate in the same way by the transfer thereto of the variable-resistance device of Moskowitz's patent. This involves the elimination of certain features of Creveling not found in applicant's combination. Bearing in mind that the applicant expressly disclaims the invention of any distinctly new element in his combination, and without analyzing the other features referred to, the foregoing proposition may be conceded to be correct in a very general sense. As before stated, applicant's contention is that he has combined old elements, changing and

adapting them in such a way as to produce a new and useful result, indicating the exercise of inventive talent, rather than of the mechanical skill of an expert electrician.

Granting a general similarity of construction and purpose in other resistance devices, it has not been denied that they operate with what has been called a "step-by-step action, tending to produce a partial and jerking regulation, whereby, through frequent increase or diminution of current, small changes would result in great variations in the brilliancy on the series of lamps. As pointed out by the applicant, with all of these old resistance devices, a considerable movement of the armature of the controlling magnet is necessary to effect regulation,—a movement which results either in bringing the armature closer to the magnet, in a position to be more strongly affected thereby, or in permitting the armature to move further away, with the opposite effect. If, then, the magnet or solenoid be of constant strength, it would have a stronger pull upon the armature or plunger owing to its being brought so much nearer thereto, or weaker owing to its being so much farther removed. And this is independent of any increase in attraction due to rise of current, and results, upon the armature moving towards the magnet, in an excessive pull thereupon and consequent increase in the field circuit beyond that contemplated by the regulating system employed. On the other hand, it is claimed that in the apparatus of the applicant no such error can arise, because there is an insignificant, almost inappreciable, movement in accomplishing the regulation, by which the armature does not, necessarily, materially approach or recede from the magnet. This nicely adjusted continuous variation of resistance, with its consequent elimination of flickering in the lamps, would be valueless if the potential or voltage coil be used with an introduction of current changes compared with which those due to a step-by-step resistance would be insignificant.

There is a special adaptation of this pressure resistance in the shunt field whereby the current is maintained substantially uniform for use with a controlling device directly affected by the current; that is to say, there is a special adaptation of this

control direct from the current for use with a resistance device of this type. If this supersensitive variable resistance device be controlled by any indirect factor, as voltage, for example, which would necessarily introduce errors into the regulation, this very sensitiveness would multiply the effect of such errors, and render the system a useless one. Therefore, to use the sensitive-pressure-controlled resistance to produce the requisite even brilliancy of the lamps, it is essential that the same be acted upon directly by the factor upon which their brilliancy depends, namely, the current.

Instancing the difficulties and failures of other systems of car lighting, the urgent demand for a new and improved one, relieved of those difficulties, and the failure of skilled electricians, working in the same field, to satisfy that demand, the applicant contends that his adaptation of former devices in a new combination, obtaining thereby a new and satisfactory result, passes beyond the boundary of mechanical skill, and attains the dignity of invention.

Between these opposing contentions we must confess some doubt as to which is the correct one.

In case of ordinary doubt, the policy of the patent system, as customarily maintained in the Patent Office, has been to give the applicant the benefit thereof, because no absolute right of property is conferred by the grant of a patent. *Ex parte Faus-ham*, C. D. 1891, 203. The patentee is merely put in a position to assert his prima facie right against infringers who may, in their defense, raise the question of the validity of the patent, and have the same finally adjudicated in the light of a full presentation and consideration of all the evidence attainable in respect of anticipation, prior knowledge, use, and the like.

In view of these considerations, the testimony going to show the practical success of the applicant's combination, the truth of which is substantially conceded, is entitled to material weight. Owing to the very serious difficulties which appear to have been successfully overcome by the applicant, other electrical train-lighting systems have not gone into general use. The demand for an improved system has been an urgent one for years, and yet

no other inventor, or electrical expert, with all the knowledge afforded by prior patents and constructions, has succeeded in devising a system answering this demand.

"Now that it has succeeded," as said Mr. Justice Bradley, "it may seem very plain to anyone that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that, if a new combination and arrangement of known elements produce a new and beneficial result never attained before, it is evidence of invention." *Webster Loom Co.* v. *Higgins,* 105 U. S. 580, 591, 26 L. ed. 1177, 1181.

We are, of course, not to be understood as maintaining that, merely because a device or combination may possess great advantages over others, thereby bringing into immediate general use, a patent should therefore be granted for it as an invention. The fact is important only in those instances where, irrespective of it, the question of novelty remains in doubt. It is only when the question of novelty is in doubt that the fact that the device has gone into commercial use, displacing others employed for a like purpose, or supplying the place of others whose intrinsic defects have prevented their general adoption and use, is sufficient to turn the scale in favor of invention. *C. & A. Potts & Co.* v. *Creager,* 155 U. S. 597, 609, 39 L. ed. 275, 279, 15 Sup. Ct. Rep. 194.

Entertaining such a doubt in this case, we think it just, and in accordance with precedent, that the applicant's demonstrated success in producing an apparatus of great utility ought to resolve that doubt in favor of his claim. *Cleveland Foundry Co.* v. *Kauffman,* 68 C. C. A. 658, 135 Fed. 360, 362.

For these reasons, the decision will be reversed as to the four claims recited, and this decision will be certified to the Commissioner of Patents as the law directs.　　　　　*Reversed.*