AMERICAN INFRA-RED RADIANT
CO., Inc., a Delaware Corporation, and
Hupp Corporation, a Virginia Corporation, Appellants,

v.

LAMBERT INDUSTRIES, INC., a Minnesota Corporation, Industrial Ceramics,
Inc., a Minnesota Corporation, and
Agard L. Lambert, Appellees.

LAMBERT INDUSTRIES, INC., a Minnesota Corporation, Industrial Ceramics,
Inc., a Minnesota Corporation, and
Agard L. Lambert, Appellants,

v.

AMERICAN INFRA-RED RADIANT
CO., Inc., a Delaware Corporation, and
Hupp Corporation, a Virginia Corporation, Appellees.

Nos. 18054, 18055.

United States Court of Appeals
Eighth Circuit.

May 20, 1966.

Rehearing Denied in No. 18055,
June 20, 1966.

J. Matthews Neale, of Strauch, Nolan, Neale, Nies & Bronaugh, Washington, D. C., made argument for American Infra-Red Radiant Co., Inc., and others and filed briefs with William A. Strauch, Washington, D. C., and Herbert M. Burns, of Wheeler, Burns & Buchanan, Duluth, Minn.

John D. Gould, of Merchant, Merchant & Gould, Minneapolis, Minn., made argument for Lambert Industries, Inc., and others and filed brief with Robert T. Edell, Minneapolis, Minn.

Before VOGEL, Chief Judge, and BLACKMUN and GIBSON, Circuit Judges.

GIBSON, Circuit Judge.

This appeal and cross-appeal from the United States District Court, District of Minnesota, concerns a patent infringement case filed pursuant to Title 35, U.S.C., § 271 in which also is injected the issue of patent misuse and anti-trust. Jurisdiction is established by Title 28, U.S.C., § 1338. At issue is the validity of two patents, the alleged infringement thereof, the alleged patent misuse, and the alleged anti-trust violation.

The District Court[1] (the Honorable Dennis Donovan) held the patents valid but not infringed, and found no patent misuse or anti-trust violation.

The patents in question were issued to plaintiff American Infra-Red Radiant Co., Inc., as assignor of the inventor, Gunther Schwank, with plaintiff Hupp Corporation serving as a nonexclusive licensee of American Infra-Red, with right to sue for patent infringement. Defendants are engaged in making and marketing devices similar to those covered in the patents and are charged by plaintiffs with infringement of both patents.

The subject matter of this litigation is an infra-red gas burner. U. S. Patent No. 2,775,294 ('294) is for the burner tile or plate, and U. S. Patent No. 2,870,-830 ('830) is for the burner housing, exclusive of the burner plate. The two units when placed together constitute the operational infra-red gas burner device. Difficult as it is, we will attempt to be accurate, brief and intelligible in our description of the device.

The burner utilizes a dish-shaped housing assembly which contains at one end a venturi or mixing tube which is in open communication with a gas nozzle and an air intake space. The gas and air are partially mixed in this mixing tube and then

1. The trial court's decision is reported in 238 F.Supp. 176 (1965).

discharged on to a deflecting and guiding surface at the opposite side of the unit. This surface reverses the flow of the gaseous mixture and guides it into a separate mixing chamber and in so doing effects a thorough and uniform distribution of the gas-air mixture within the chamber (Patent '830). This dish-shaped housing unit has a flat planer open top on which are mounted the perforated ceramic plates of the '294 patent. The plates are mounted individually or in multiples of two, four, six, etc., but will be hereafter referred to as the plate or ceramic plate. The plate covers the entire opening, thus making a confined chamber except for the mixing tube, which is in open communication with the air and gas inlets. The pressure in the mixing tube caused by the incoming gas and air is somewhat greater than the pressure in the mixing chamber immediately beneath the perforated ceramic plate which causes all of the combustible mixture to be expelled under low pressure through the apertures in the plate. This ceramic plate resembles a perforated disc that contains many small holes allowing the gas to pass to the outer side thereof, at which point combustion takes place. The burning of this gas-air mixture at the surface of the ceramic tile is almost flameless and it heats the surface of the tile to a reddish incandescent glow, which in turn radiates infra-red heat waves. These rays travel through the surrounding air without heating it. Upon striking an opaque object these infra-red rays are then converted into heat.

In order for the burner to successfully operate, it is necessary that the gaseous mixture be ignited only on the surface of the ceramic plate and not in the mixing chamber behind the plate. When this premature ignition occurs in the mixing chamber it is known as "backfiring." To prevent this "backfiring" the ceramic burner plate must be of sufficiently low thermal conductivity to insulate the red hot outer surface (1500 to 1700° Fahrenheit) from the necessarily cool interior. Furthermore, the perforations in the tile must be small enough to prevent heat from the burning gas to travel back into the mixing chamber, yet large enough to eliminate too much pressure from building up in the mixing chamber.

Another characteristic of this type of infra-red burner is that it is intended to operate at the relatively low "ordinary town gas pressures", with all of the air required for combustion being inspired into the mixing tube without the use of a compressor. If the perforations in the ceramic plate are too small in relation to the pressure of the incoming gas, the continuous and even flow of the gas and air through the perforations in the burner plate is restricted, thus causing a "back pressure." This "back pressure" results in insufficient inspiration of air into the mixing tube. So, the diameter and number of perforations in the burner plate are important in two respects: One, they must be small enough in size to prevent "backfire" from the hot surface of the plate, and two, they must be large enough in size and sufficient in number to keep "back pressure" from preventing inspiration of sufficient air into the mixing tube.

In addition to the above factors, due to the complex nature of gas flow, the thickness of the burner plate and consequently the length of the perforations through which the gas flows on its way to the burner surface is an important factor in the burner's efficient operation.

Finally, since different gaseous fuels have different ignition temperatures, ignition speeds, and inspirating qualities the type of fuel used is a factor to correlate with the other considerations mentioned. A change in the chemical composition of the gas may require a change or variation in the size and number of the holes in the ceramic tile. Thus the size of the perforations, the number, and the length thereof are of vital importance and must be properly correlated with each other and the other variables mentioned to achieve the desired result.

Patent '294 issued December 25, 1956, covering the ceramic burner plate, requires that the tile have generally parallel passages through which the gaseous mix-

ture may pass, which passages must be evenly distributed over the area of the tile with the total cross-sectional area of the passages being not less than "about 20 per cent" of the total radiation area of the surface of the burner plate. The individual passages are to be not less than 5 millimeters (about 6/32 of an inch) in length and a cross-sectional area of not more than 4 square millimeters (about 6/1000 of an inch) each. A heat retarding medium of substantially lower thermal conductivity than the clay or refractory material of the plate is to be distributed throughout the plate with the thermal conductivity not exceeding "0.5 kc/hr. m.°c." (.5 kilocalories per hour, per meter, per degree, centigrade). The heat retarding medium is composed of pockets of air or voids within the ceramic itself. The pockets are produced by sintering the clay or other material used to form the tile block; that is, by incomplete firing of the clay ceramic during its construction. The impurities in the clay are burned out without fusing the remaining material together in a solid mass. The result is small pockets or voids containing air which has 10 to 100 times less thermal conductivity than the surrounding solid ceramic.

Patent No. '830 issued January 27, 1959 is concerned with the general housing of the burner plate, including the positioning of the component parts and structural arrangement of the burner. The aim of the patent is to provide a maximum burning surface while having minimum overall dimensions, particularly depth, thus providing maximum heat while taking up a minimum of space.

Defendants manufacture and sell three types of ceramic burner plates, two with cylindrical passages and one with slotted passages; all of which allegedly infringe upon plaintiffs' '294 patent. The housing unit for the burner plate manufactured and sold by defendants is somewhat similar in design to the specifications in plaintiffs' patent, but there is some variation in the overall dimension.

In defending this infringement case, defendants have alleged that both of plaintiffs' patents are invalid and even if valid there was no infringement. In addition, they have asserted the affirmative defense of patent misuse and have counterclaimed for damages, alleging that the patent misuse was a violation of the antitrust laws entitling recovery of treble damages. The basis of the closely related patent misuse defense and the antitrust counterclaim is the license and sales agreement between American Infra-Red and Hupp Corporation. Defendant contends that the agreements constitute illegal exclusive dealing contracts and tie-in agreements.

The trial court held the patents valid on the ground that the "very heavy burden"[2] imposed on defendants to overcome the statutory presumption of validity was not met by defendants and on the basis of the admitted commercial success of the plaintiffs' commercial burner. The trial court went on to declare that neither patent had been infringed upon and that plaintiffs had not violated the anti-trust laws with their licensing and sales agreement.

Plaintiffs applaud that portion of the trial court's decision holding their patents are valid and that there has been no patent misuse or anti-trust violation, but assert that the holding of non-infringement is clearly erroneous. Defendants in turn applaud the court's decision of no infringement, but contend that the decision holding the patents valid and the holding of no anti-trust violation is clearly erroneous.

There being dual issues of validity and infringement, the proper procedure demands that we first determine the validity of the patents in question be-

2. In Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 Chief Justice Hughes said: " * * * [T]he burden of proving want of novelty is upon him who avers it * * * [and] his burden is a heavy one, as it has been held that 'every reasonable doubt should be resolved against him.' "

fore we can approach the issue of infringement. We will first consider the validity of Schwank patent '294 (ceramic burner plate), after which we will discuss Schwank patent '830 (housing unit).

### Validity of '294

It is fundamental that for a patent to be valid it must demonstrate three separate and distinct elements: "novelty," "utility" and "invention." We are concerned herein only with the elements of "novelty" and "invention" as "utility" is admitted or evident. When we say that a patent must possess "novelty" we mean that it must be new. As required by the statute, to be patentable the device must not have been "known or used by others in this country, or patented or described in a printed publication in this or a foreign country * * *." 35 U.S.C. § 102(a). In addition to "utility" the statutes have always demanded that a patent be novel. However, in addition to these two statutory elements of patentability the courts for over a hundred years have demanded of all patents an additional requirement of "invention." The exact definition of "invention" has varied from time to time and from court to court. However, it was generally agreed that a mere improvement over prior art which involved nothing more than what would have been obvious to a person skilled in the art and requiring nothing more than the application of mechanical skill could not be considered as "invention." See 2 Deller's Walker on Patents, § 104–106 (2nd Ed. 1964). The Patent Act of 1952 (35 U.S.C. § 103) codified this general judicial requirement as the third statutory requirement of patentability. The statute states in effect that a patent is not valid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." In interpreting this statute the Supreme Court in the recent case of Graham v. John Deere Company of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (February 21, 1966) (cert. from 8 Cir., 333 F.2d 529) prefers to call this time honored, now codified, judicial requirement, heretofore known as "invention," the "test of obviousness." The Court made it clear that the statute merely codified the decisional law and the necessary level of innovation previously demanded by the courts had not been changed by the statute. However, the Court felt that "obviousness" should be emphasized rather than "invention" and that the "test of obviousness" as set out in the statute be applied as the sole test for the third element of patentability. Therefore, in addition to "utility" and "novelty" patents must contain "non-obviousness."

The thrust of defendants' attack on the validity of patent '294 is concentrated on a demonstration of prior art not considered by the patent examiner. Defendants contend that this prior art conclusively demonstrates a lack of novelty and inventiveness in the Schwank patent. As prior art defendants rely primarily upon a 1915 British Patent Number 6312 by McCourt. This patent is admittedly very similar to the Schwank patent, a similarity that will soon be demonstrated in full. In addition to this McCourt patent, defendants cite two articles dealing with radiant burners, one by Keller in 1949 and one by Trinks in 1942. Neither the McCourt patent or the prior art publications by Keller and Trinks were cited nor considered by the patent examiner.

To determine if the Schwank patent has been anticipated because of its obviousness or lack of novelty, it is necessary to compare the various claims of the patent with the teachings of the prior art. Our attention is first directed to the general or broad characteristics of this patent as compared with the prior art in the field. In making such a comparison it clearly appears to us that the Schwank patent has all of the broad characteristics found in the prior McCourt patent, many of which also appear in the Keller and Trinks publications.

1. Both patents deal with gas burners which produce infra-red heat rays using the same principles of physics.

2. As a heating unit both employ a block of refractory ceramic material.

3. Both construct their heating blocks with cavaties or voids filled with air which serve as a heat retarding medium to lower the block's thermal conductivity.

4. Each perforates his block with uniformly distributed passages through which the fuel mixture flows to the surface of the block.

5. At the surface of the block the fuel mixture is ignited, causing the face of each of the blocks to become heated to incandescence.

6. Both mount this heating unit at the top of a chamber, in which air and gas are mixed before reaching the surface of the unit.

Not only are all of these general characteristics of Schwank anticipated by the McCourt patent, but all of the major problems and objectives of the burner were foreseen not only by McCourt but also by the Trinks and Keller publications.

1. The burners are designed to operate at normal "town" gas pressure.

2. The burners are designed to inspirate all of the air necessary for successful combustion without the need of a blower or compressor.

3. The burners are designed to prevent "backfiring."

In order to attain these three goals and to construct a successful radiant burner, Schwank set forth in his patent four specifications for his burner plate. 1) The cross-sectional area of each perforation in the block should be below a 4 sq.mm. maximum. 2) The thermal conductivity of the block should be less than .5 kilocalories per hour per meter per degree centigrade. 3) The thickness of the plate should be at least 5 mm. (6/32 of an inch). 4) The ratio of the perforation area to the surface area should be not less than "about 20%."

In comparing each of these four specifications for a successful burner set out by Schwank with the teachings of McCourt, the similarity between the patents is evident.

1. Cross-Sectional Area of the Individual Perforations. McCourt taught a measurement of 1.17 sq.mm. which clearly anticipated the 4 sq.mm. maximum set out by Schwank. (Plaintiffs' commercial block is very near the McCourt teaching with measurements of .8 sq.mm. and 1.3 sq.mm.).

2. Thermal Conductivity. A block constructed in accordance with the specifications of McCourt had a thermal conductivity of .181. Schwank taught a .5 maximum and was thus anticipated by the McCourt disclosure. (Duplicating almost exactly the McCourt figure, plaintiffs' commercial tile has a conductivity of .180).

3. Thickness of the Burner Plate. McCourt's block measured 12/32 of an inch, again anticipating the Schwank disclosure calling for an excess of 6/32 of an inch. (The thickness of the McCourt block is almost duplicated by plaintiffs' present block which measured 15/32 of an inch).

4. Ratio of Perforation Area to Surface Area. While Schwank calls for a ratio of not less than "about 20%", McCourt in his specific examples only had ratios of 14.3% and 16.2%. (Commercial blocks are manufactured by plaintiffs with various different ratios, such as 25%, 35% and 40%).

■■ It is clear from the above comparison, from the statements of plaintiffs' own expert witnesses, and from the admission found in plaintiffs' supplemental brief,[3] that the Schwank patent has been anticipated in all ways save the possibility of one; this one being Schwank's teaching of a ratio of not less than "about 20%" while McCourt's pat-

---

**3.** Plaintiffs-Appellees' brief, p. 10: "Since the greater than 20 per cent passage area to tile surface area ratio is the sole and outstanding structural difference over McCourt * * *"

ent lists ratios of only 14.3% and 16.2%. Our task then is to determine if this single difference found in the stated ratios as they appear on the face of the patents entitles Schwank to a patent monopoly on his burner plate. We do not believe that it does. We have two basic reasons for this conclusion. One, given a proper interpretation of the entire teachings of McCourt the conclusion is inescapable that the Schwank patent was invalid for want of novelty. Two, even if we were to rule that the apparent difference is novel, we believe that the advance would have been obvious to one skilled in the art. Therefore, this obvious step cannot constitute "invention" necessary to allow a patent monopoly.

Considering first "novelty", if all of the claims of the Schwank patent were first taught by McCourt, the law demands that the Schwank be held invalid. It is admitted that all but one of the Schwank claims have in fact been anticipated by the McCourt teaching. Further, upon close analysis of the sole alleged differences in the patents it is equally clear that no true difference actually exists. What appears at first glance to be a difference is illusionary. In all respects, therefore, McCourt anticipates the teaching of Schwank.

■ To illustrate, we believe it would be a mistake to interpret McCourt, as have the plaintiffs, as teaching nothing more in the area of ratios than the bare figures of 14.3% and 16.2%. On the contrary, McCourt gave complete general teachings in the area of radiant burners. The detail explanation of the experimentation process which McCourt sets out is as much a part of the existing art as the figures he gives. In this case the process is far more important than the figures.

In his patent McCourt taught that to construct a successful burner one had to account for a number of variables, such as the chemical composition of the gas, the pressure of the gas, the desired surface temperature, and the thickness of the block. To compensate for these variables he taught that it would be necessary to either change the number or the diameter of the perforations, which of course consequently alters the perforation to surface ratio. He specifically illustrated his discovery by teaching that if you changed the composition of the gas you would need to change the diameter of the perforations, but if you used a thicker block you had to increase the number of perforations. In order to determine the correct diameter and number of perforations under a given set of these variables McCourt taught that one had to construct a number of test burner plates and empirically experiment with each plate under each set of circumstances. The figures of 14.3% and 16.2% represent the results of two of these experiments. In themselves they were not considered to be teachings or rigid specifications. They were only the results of experiments with given variables and with variation in the variables the ratio figures would necessarily change. The importance of McCourt's teaching is found not in the illustrative figures, but in the discovery of the various factors that influence the operation of radiant gas burners and the teaching of empirical experimentation to obtain a workable burner plate when these factors are varied.

■ Having concluded that the difference in the ratio figures does not of itself indicate that the Schwank patent was novel, and that the ratio figures set out by McCourt were not a definitive part of his teachings, we must now examine the McCourt teachings themselves on the issue of ratio to see if they encompass the later ratio teachings of Schwank. "It is well settled that a patent cannot be properly granted for the discovery of a result which would flow naturally from the teaching of the prior art." Application of Libby, 255 F.2d 412, 45 CCPA 944 (1958). As we have seen the McCourt patent pointed out the numerous variables to be considered. It told us how to compensate for these variables by changing either the diameter or the number of holes according to the variable affected. Finally, he taught that to correctly cor-

relate a number of variables one had to resort to empirical experimentation. Therefore, given correct information on a set of variables and using this teaching, it appears to us that a mechanic could well construct a burner within the "about 20%" minimum ratio set out by Schwank. This opinion is to a large degree confirmed by one of plaintiffs' own expert witnesses and by the record fact that it is the McCourt method of empirical experimentation that is followed by the industry today when confronted with an untested variable. It is our conclusion that since a mechanic would be able to construct a burner following only the teachings of the prior McCourt patent, and the burner so constructed could well fall within all of the specifications and claims of the later Schwank patent, Schwank was not entitled to patent protection. If we were to hold otherwise, McCourt himself would be deprived of the right to exploit his invention in the face of the later Schwank patent. Such is clearly not the law. Therefore, it is our opinion that the burner described in the Schwank patent '294 "would flow naturally from the teaching of the prior art" and as such lacked the necessary "novelty" for patentability under 35 U.S.C. § 102 (a).

Even were we to assume arguendo the ratio specified by Schwank as a minimum was not first taught in principle by McCourt, we do not believe that the addition of a few more holes per block or increasing the diameter of the existing holes can be considered "a creation of the inventive faculty" as set out in Aro Equipment Corporation v. Herring-Wissler Co., 84 F.2d 619, 622 (8 Cir. 1936). In fact in applying the test of "obviousness" as promulgated by the Supreme Court in the *Graham* case, supra, we believe that such an advance, if any, would have been obvious at the time it was made to a person having ordinary skill in the art. The "obviousness" of Schwank's step is further emphasized when viewed in the light of McCourt's patent which clearly taught variation in the number and diameter of the perfora-

tions. We have held in the past and we continue to hold that "[i]nvention will not be decided on the narrow issue of degree", and that the mere changing of form, proportions, or size will not alone constitute "invention." Swenson v. Boos, 156 F.2d 338 (8 Cir. 1946). This is true even though the change brought about better results. Midland Flour Milling Co. v. Bobbitt, 70 F.2d 416 (8 Cir. 1934). Society has an interest to protect in patent litigation and its interests demand that the complete protection afforded by a patent not be allowed for petty, insignificant, and obvious advances. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Ditto, Incorporated v. Minnesota Mining & Manufacturing Co., 336 F.2d 67 (8 Cir. 1964). Therefore, we conclude that even if "novel", patent '294 lacked the necessary "invention" or "nonobviousness" required by 35 U.S.C. § 103 and Graham v. John Deere Company of Kansas City, supra.

Though not to be considered as prior art, we could not help but note the decision of the patent offices of the countries of Western Germany and the Netherlands which were in evidence before the trial court. In lucid opinions following adversary type proceedings the patent offices of these two countries denied to Schwank a patent on a burner plate identical to the '294 patent. In March 1955 the German Patent Office denied Schwank a patent primarily on the basis of the McCourt patent. In a September 1959 decision the Netherlands Patent Office concluded "that the burner according to the application was known from Keller's paper." "[T]he application does not * * * contain any other indications than those already given by Keller." These decisions, while certainly not controlling, are evidence on the factual issue of "invention."

In reaching our conclusions herein we have not been unmindful of the rule set out in Rota-Carb Corporation v. Frye Manufacturing Co., 313 F.2d 443 (8 Cir. 1963), that the issue of whether an improvement constitutes

mere mechanical skill or involves the exercise of invention is a question of fact which is conclusive unless clearly erroneous. In the first place the validity of the Schwank patent did not revolve solely around the issue of "invention" versus "mechanical skill." Involved first was the question of "novelty" as set out in 35 U.S.C. § 102(a). A determination of this issue involved primarily a comparison of the prior McCourt patent with the later Schwank patent to ascertain if the teachings of the former were repeated in the latter. We concluded after making such a comparison that the Schwank device was in fact fully described in the McCourt patent and thus lacked the necessary "novelty" of patentability. Such a determination was based upon an examination and interpretation of two legal documents to determine if the statutory requirements of patentability had been fulfilled. Inasmuch as these documents are equally available to this Court, we do not believe that the trial court's particular interpretation is a factual conclusion binding under Rule 52(a). The appellate court has the prerogative to interpret the exhibits for itself. Nicholson v. Carl W. Mullis Engineering and Mfg. Co., 315 F.2d 532, 536 (4 Cir. 1963); New Wrinkle, Inc. v. John L. Armitage & Co., 277 F.2d 409, 412 (3 Cir. 1960); Kiwi Coders Corporation v. Acro Tool & Die Works, 250 F.2d 562, 568 (7 Cir. 1957).

█ Secondly, the part of the trial court's decision which found the element of "invention" in the Schwank patent we believe was induced by an erroneous view of the law. Even accepting "invention" as being a question of fact,[4] application of erroneous standards of invention or misconceptions as to the applicable law, in themselves make factual conclusions of patentability clearly erroneous. Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Selmix Dispersers, Inc. v. Multiplex Faucet Co., Inc., 277 F.2d 884 (8 Cir. 1960).

█ There can be no doubt that the trial court applied an erroneous standard of invention in determining the validity of the Schwank patent. The trial court stated "A new combination resulting in improved construction which brings forth a new and more efficient result than prior art devices is patentable." The Supreme Court in the *Graham* case determined on this issue that a somewhat similar standard was incorrect and held that the "test of obviousness" was the *only* correct test to be applied in determining whether a new combination of known components amounts to "invention." The decision of the trial court clearly indicates that no standard of obviousness was applied.

█ Furthermore, in reaching its decision the trial court seemed to rely heavily on two conclusions of law. On the basis of 35 U.S.C. § 282 the trial court correctly ruled that the Schwank patent was presumed valid. Defendant, it said must bear a "very heavy burden" in overcoming this presumption of validity. Due to the conflict of expert testimony, the court said, that defendants had failed to shoulder this "very heavy burden." As a second point the trial court placed heavy emphasis on the commercial success of the Schwank commercial burner and on the fact that the McCourt burner did not work properly. Under the unique circumstances of this case we believe that the trial court's heavy reliance on the above law was misplaced.

4. There is considerable doubt that "invention" should always be treated as a question of fact. See: 2 Deller's Walker on Patents § 105 (2nd Ed. 1964) pg. 67. United States v. Esnault-Pelterie, 303 U.S. 26, 30, 58 S.Ct. 412, 82 L.Ed. 625 (1938); Sbicca-Del Mac. Inc. v. Milius Shoe Co., 145 F.2d 389, 396 (8 Cir. 1944); Rohr Aircraft Corporation v. Rubber Teck, Inc., 266 F.2d 613, 618 (9 Cir. 1959); Hanovia Chemical & Mfg. Co. v. David Buttrick Co., 127 F.2d 888, 890 (1 Cir. 1942); Fritz W. Glitsch & Sons v. Wyatt Metal & Boiler Works, 224 F.2d 331, 335 (5 Cir. 1955); Nickerson v. Bearfoot Sole Company, Inc., 311 F.2d 858, 882 (6 Cir. 1962).

Although a patent is presumably valid, the ultimate question of patentability is for the courts. Continental Farm Equipment Co., Inc. v. Love Tractor, Inc., 199 F.2d 202 (8 Cir. 1952). This rebuttable presumption cannot be allowed to stand in the face of compelling contrary facts as we have herein. In such a case the court is not obliged to yield its judgment to a presumption which merely arises from the patent itself. Crosley Corporation v. Westinghouse Electric & Mfg. Co., 152 F.2d 895 (3 Cir. 1945).

Not only has this presumption of validity been overcome by the great weight of the evidence, but perhaps of prime importance, the presumption itself has been very much weakened, if not completely destroyed, by defendants' proof of pertinent prior non-considered art. We have already seen that the McCourt patent is an extremely relevant prior art reference. Even by plaintiffs' own charts in evidence McCourt is far more relevant than any art cited by the patent examiner. In addition, there were introduced the Keller and Trinks articles which demonstrate general principles later incorporated in the Schwank patent. It is clear that none of this very pertinent art was before the patent examiner when he granted the Schwank patent. Even without the benefit of this very pertinent art the patent office only granted Schwank his patent after considerable debate, hesitation, and discussion. Therefore, we have before us a borderline case in a crowded art, in which three pieces of extremely relevant prior art were not before the patent office. In such a case we believe that there is every possibility that the prior art of McCourt, Keller, and Trinks would have heavily tipped the scales against the granting of the patent had this prior art been known to the patent examiner. With a showing that this most relevant of all prior art was not considered by the patent office, we believe the normal presumption of validity was greatly weakened if not completely destroyed. L. S. Donaldson Company v. La Maur, Inc., 299 F.2d 412 (8

Cir. 1962); Heyl & Patterson, Incorporated v. McDowell Company, 317 F.2d 719 (4 Cir. 1963); Cornell v. Adams Engineering Company, 258 F.2d 874 (5 Cir. 1958). In fact it is difficult to imagine how a patent has any presumption of validity over pertinent prior art references when these references were not before the patent examiner. A. R. Inc. v. Electro-Voice Incorporated, 311 F.2d 508 (7 Cir. 1962); Rohr Aircraft Corporation v. Rubber Teck, Inc., 266 F.2d 613 (9 Cir. 1959); Mohasco Industries, Inc. v. E. T. Barwick Mills, Inc., 221 F.Supp. 191 (N.D.Ga.1963) affirmed per curiam 340 F.2d 319 (5 Cir. 1965). Therefore, we are no longer dealing with a strong presumption of validity on the part of the Schwank patent, but with a presumption of validity that was greatly weakened. In such a situation the defendants obviously do not have to bear the heavy burden necessary to overcome a presumption at its full strength.

As a second pillar for its decision the trial court placed great reliance on plaintiffs' commercial success. As applied to the facts of this case, we believe that this reliance, too, was misplaced. While we recognize that a court may consider this factor, it certainly is not a prime consideration. Commercial success without invention undoubtedly cannot support a patent. Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., supra; Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235 (1949). While commercial success may help in close questions, commercial success is certainly not decisive within itself. L. S. Donaldson Company v. La Maur Inc., 299 F.2d 412 (8 Cir. 1962); Tropic Aire, Inc. v. Sears Roebuck & Co., 44 F.2d 580 (8 Cir. 1930). The relevancy of "commercial success" is based upon the assumption that public acceptance of a device is indicative of that device's novelty and invention over prior art in the field. Therefore, when explanations other than invention are brought forth to indicate reasons for the commercial success, the evidentiary weight of this factor is all

but destroyed. Day-Brite Lighting, Inc. v. Sandee Manufacturing Co., 286 F.2d 596 (7 Cir. 1960); 69 C.J.S. Patents § 70 at pages 323–324. We believe that there are many explanations for plaintiffs' commercial success other than the claimed invention or novelty of this particular patent.

In the first place there are a number of explanations why the McCourt burner never achieved financial success. In 1915 there was difficulty in mass producing on today's scale. The record contains evidence that McCourt's procedure for making these tiles was necessarily crude and time consuming. This, in itself, would make successful marketing unlikely. Secondly, it appears from the record that there was no widespread availability of inexpensive and constant quality gas until relatively recent times, which too would inhibit commercial exploitation of the device. Finally, there is every likelihood that in McCourt's time our society had not developed to the point where there was a substantial demand or market for radiant gas burners.

On the other side of the picture there are even more numerous explanations for the particular commercial success of plaintiffs. Perhaps foremost among these is the fact that the chemical composition and manufacturing process of the ceramic tile is a trade secret of plaintiffs not covered by the patent. In addition plaintiffs have made many modifications in the housing unit that, of course, are not covered by this patent. For instance we find a reduction in the size of the mixing chamber as found in patent '830 and many other non-patented modifications in the internal arrangement of the unit. In addition we see the addition of metal reflectors and protective screen. All of this has contributed to the effective and efficient operation of the burner, yet none are related to the invention of the patent in question. We also note that the burner plate used by plaintiffs vary markedly from the figures set forth in their patent. In addition we see that plaintiffs manufacture various sizes and types of burners thus appealing to a wide market. Some of the burners are very large, designed for use in industrial heating, and using natural gas as a fuel. Others are very small, use bottled gas, and are designed to warm the hands of the outdoor sportsman. In association with this adaptation to various uses, plaintiffs have undertaken an extensive advertising and promotion campaign. They have developed different models of burners for various uses and have extensively advertised and energetically promoted these markets. Last, but not least, plaintiffs have developed an organization for the manufacture and sale of these devices that is international in scope.

There being numerous explanations for the commercial success of plaintiffs' burner, it is difficult to say with any force that this success was due to the invention of the burner plate patent. Under the circumstances, commercial success is not a weighty factor in deciding the issue of patentability.

Finally, the trial court seemed to be strongly influenced by the feeling that the McCourt device did not work. Plaintiffs' evidence of the unworkability of the McCourt burner is far from being conclusive. In his patent, McCourt gave every indication that it worked properly, describing with particularity the red glow. The tests conducted by plaintiffs' experts, indicated that it did not work as well as plaintiffs' burner, but nonetheless did admit that it did gain some incandescence. Finally, as taught by McCourt the type of block for successful use will greatly be influenced by the type of gas you utilize. Knowing this, there is nothing to indicate that the tests conducted by plaintiffs in their laboratory or the tests conducted before the court utilized the type of gas necessary for the successful operation of the burner under the circumstances.

Furthermore, even if we accept the proposition that the McCourt burner did not work, we do not believe that undue emphasis should be placed on this factor. Even an unsuccessful effort to embody the concept will suffice as invention so long as this effort discloses that the inventive idea was complete. Anticipation

is not avoided by showing of lack of prior success if all that remains to be done to make the device successful are changes involving the application of mere mechanical skill. Simmons v. Hansen, 117 F.2d 49 (8 Cir. 1941); 1 Deller's Walker on Patents § 57 (2nd Ed. 1964) at page 240.

■■■ It is our conclusion, therefore, that the Schwank patent '294 is invalid for want of "novelty"; and even if novel, the patent certainly lacked the necessary "invention." The trial court's finding on this point is clearly erroneous in light of the evidence and in view of an application of erroneous standards of invention, and therefore must be reversed. Rule 52(a), Fed.R.Civ.P. Since '294 is invalid as a matter of law, the question of infringement is rendered moot. There can be no infringement upon an invalid patent. Ditto Incorporated v. Minnesota Mining & Manufacturing Company, 336 F.2d 67 (8 Cir. 1964).

### '830 Validity

■■ Having thus disposed of patent '294 (burner plate), we now must determine the validity of the '830 (housing unit) patent. Defendants assert a statutory bar against the '830 patent based on 35 U.S.C. § 102(d). Apparently the inventor Gunther Schwank had the device, structure, or design of the burner housing which is the basis of the '830 patent also patented in Germany under a Gebrauchsmuster which is a lesser type of patent issued for petty or useful models and designs. Defendants contend that, if Gebrauchsmuster No. 1,660,844 issued to Schwank is a patent, United States Patent '830 is invalid under provisions of 35 U.S.C. § 102(d) which holds in its pertinent part:

"Sec. 102 A person shall be entitled to a patent unless—

"(d) the invention was first patented * * * in a foreign country prior

to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States,"

This contention is correct. It is admitted that the Gebrauchsmuster application was made in Germany on May 22, 1953 which is more than twelve months prior to the application in the United States on October 28, 1954. The registration was effective or granted on July 9, 1953 with the name of the inventor, title, and registration number being published in the Patentblatt (Official Journal) on August 6, 1953. Obviously then the Gebrauchsmuster was granted prior to the United States application in October 1954. Although plaintiffs make some contention that defendants have not shown that the exact type of structure as is represented in the '830 patent is the basis of the Gebrauchsmuster, we feel that the record clearly discloses that the structures are the same.[5] In fact Schwank in his '830 application stated:

"That no application for patent on this invention or discovery has been filed by me * * * in any foreign country * * * except as follows: Germany May 22, 1953."

The crucial premise, therefore, is whether a Gebrauchsmuster is a patent within the meaning of aforesaid § 102 (d). If it is, § 102(d) is a statutory bar to its validity. The District Court did not consider or rule on this issue.

■■■ Unlike the law in this country in which we generally only have one class of patent covering all types of patentable structures, processes, or compositions of matter,[6] Germany has two distinct classes of invention protection. It appears that in Germany the standard as regards patentable invention for regular patents is very high, making it difficult to secure such a patent for minor or simpler inventions. To meet this situa-

---

5. A comparison of the drawings and disclosures of Gebrauchsmuster No. 1,660,-844 (Ex. S-1) with the original application claims and drawings of the '830 show conclusively that the same device of a gas burner housing is the basis for both the Gebrauchsmuster and patent '830.

6. The exception being ornamental design patents under 35 U.S.C. §§ 171–173.

tion the Gebrauchsmuster law was adopted as supplementary legislation to give a measure of, though limited, protection to useful or petty models which do not possess a sufficiently high standard of invention to meet the requirements of the regular patent laws. Gebrauchsmusters, however, cover only structures, not processes, formulas, or compositions of materials; and there is no examination by the patent office for novelty, thus leaving the question of novelty to first arise when suit is brought.

In addition to being an important and integral part of the patent law of Germany it is apparent that the Gebrauchsmuster has the elements of the more conventional form of patent. The rights granted an inventor under the Gebrauchsmuster law gives a monopoly for a term of three years, renewable for an equivalent period, thus giving a total of six years of protection. The Gebrauchsmuster gives the inventor the exclusive right of use of the article and to recover damages for infringement, with the claims made and accepted measuring the scope of the protection afforded. There is even a limited publication of the Gebrauchsmuster. If the application is granted, the title, inventor, date and file number are published in the official Patentblatt. Though specifications and drawings are not disclosed in any official publication, the application which contains the specifications, drawings and claims is registered and the entire file is open to public examination in the patent office.

There are no judicial cases indicating how a Gebrauchsmuster should be treated under the provisions of § 102(d), and only scant authority as to how Gebrauchsmusters are to be treated under other provisions of our patent law. What authority there is, however, seems to indicate that the Gebrauchsmuster should be treated as a foreign patent. Judge Lindley in Permutit Co. v. Graver Corporation, a District Court decision reported at 37 F.2d 385, at page 390 (N.D.Ill.1930) observed:

"Evidently a Gebrauchsmuster is a patent within the meaning of the federal statute, as Judge Haight said in the case of Safety Gas Lighter Co. v. Fischer Bros. & Corwin (D.C.) 236 F. 955, 962: 'The rights conferred on an inventor by a German Gebrauchsmuster, except as to time, seem to be quite as extensive as those guaranteed by a patent in this country. Its grant is the act of the government. Although only the title is published, in the sense that it is printed in an official publication, the specifications and drawings of the patent are open and accessible to the public, as are also the claims, which measure the scope of the protection afforded to the inventor, as soon as the title, date of application, and registration are published in the Patentblatt. As it is not essential that a foreign patent, to have the effect mentioned in section 4886 of the Revised Statutes, should be printed, but that the act of the officials in granting it and accessibility of its disclosures to the public are the decisive factors, I am at a loss to understand how the fact that only a title is printed, or how the scope of the invention which it protects, or that the examination made in the Patent Office before it is granted is limited, can have any effect on it under our laws.' "

This case was affirmed by the Seventh Circuit, 43 F.2d 898 on other grounds and affirmed by the Supreme Court at 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163. Certiorari was apparently granted by the Supreme Court because of holdings in other Circuits which had sustained the patent in question. Speaking for the Court, Mr. Justice Brandeis held the patent invalid without discussing the force and effect of a German Gebrauchsmuster.

In Safety Gas Lighter Co. v. Fischer Bros. & Corwin, 236 F. 955 (D.C.,D.N.J., 1916), affirmed 247 F. 1005 (3 Cir. 1918), the Court held a Gebrauchsmuster was available as a reference to anticipate and limit a later United States Patent and should be considered as part of the prior art.

Of considerable interest to us is the position of the United States Patent Office in regard to Gebrauchsmusters. It

appears that for many years the Patent Office has treated the Gebrauchsmuster as a patent. This policy is illustrated by a discussion in the Official Gazette under date of November 2, 1965. In discussing the status of the Gebrauchsmuster the Gazette reads:

"1. Right of priority.—An application for a Gebrauchsmuster is considered to be an application for a patent in a foreign country, and consequently the right of priority of 35 U.S.C. 119 can be based upon such an application. This was decided by the Board of Examiners-in-Chief (now Board of Appeals) in 1908 * * * and has been consistent practice ever since."

"3. Prior patents.—The Examiners may use the Gebrauchsmuster, however, as a prior patent effective as of the date of registration, in the same manner as they would use the patents of countries which do issue specifications in printed form; * * *"

After making reference to Ex Parte Smith 82 USPQ 83 (Board of Appeals) which held that Gebrauchsmusters were not patents under § 4886 (present § 102 (a) (b) (c)), it said:

"* * * [B]ut after this decision [Ex Parte Smith] Examiners have nevertheless used Gebrauchsmusters as prior patents, after consultation with the Solicitor's office, to reject applications or dissolve an interference for unpatentability of the counts."

The Gazette then sets forth an amendment to § 901.05(b) of the Patent Regulations by adding the following after the second paragraph on page 139:

"German Utility Models (Gebrauchsmuster) may be used as references as prior patents, but not as prior printed publications, effective as of their registration date. When necessary the Librarian will obtain the complete text of the specification from the German Patent Office. * * *"

From the entire publication we believe that it has been the past and the present practice of the Patent Office to treat the Gebrauchsmuster as a patent. We are not giving any retroactive effect to the recent amendment. We only believe that this amendment and the accompanying explanation codify what has been the historical practice of the Office when confronted with a Gebrauchsmuster.

Section 119 of Title 35 establishes a right of priority for foreign filed patents. Its pertinent part states:

"An application for patent for an invention filed in this country by any person who has, * * * previously regularly filed an application for a patent for the same invention in a foreign country * * *, shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was first filed in such foreign country, if the application in this country is filed within twelve months from the earliest date on which such foreign application was filed; but no patent shall be granted on any application for patent for an invention which had been patented * * * more than one year before the date of the actual filing of the application in this country, * * *."

As we have seen it has long been the policy of the Government, both through international convention and internal policy to treat the Gebrauchsmuster as a patent entitled to the priority granted under § 119. Since the Gebrauchsmuster is considered a patent for the purpose of § 119 in obtaining the benefit of an earlier filing date to establish its priority, the same construction should be placed on the word "patent" as used in § 102(d). It is receiving the advantage of being a patent under § 119, therefore, it should be subject to the disadvantages imposed under that same section and under § 102(d).

The word "patent" has many general connotations and nuances but must be considered in the context in which it is used by Congress in implementing the Constitutional grant of authority conferred by Article I, Section Eight, Par. 8 of the Constitution: "To

promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries; * * *." As used by Congress in the different sections dealing with the establishment of a patent system we must apply the particular connotation, which is to a certain extent a word of art, that would make effective the Congressional intent. Webster's New World Dictionary defines "patent" as (among other definitions) "n.l. A document open to public examination and granting a certain right or privilege; letters patent; especially, a document granting the monopoly right to produce, use, sell, or get profit from an invention, process, etc. for a certain number of years." Black's Law Dictionary generally defines a patent as "A grant of some privilege, property, or authority, made by the government or sovereign of a country to one or more individuals." The German Gebrauchsmuster falls within these accepted definitions of a patent.

■■ We note that Congress made no differentiation in the type of foreign patent that would be affected by the statutes. Therefore, we may assume that Congress intended to include in the term "patents" all foreign patents that fall within the well known classical definitions. Obviously the length of the period of protection is not decisive on this issue. Each country has the right to its own view and policy on this point. In fact our policy as expressed by Congress has changed, once granting only fourteen years of protection, now granting seventeen years; and is susceptible to further variation as a matter of legislative policy. Our Constitution commands no precise length of time, only "limited times." Therefore, as a matter of policy or Congressional intent it would not seem that the brevity of the Gebrauchsmuster would alter its essential nature.

For the above reasons we have concluded that a Gebrauchsmuster is a foreign patent within the purposes of § 119 and § 102(d). It is an important part of the German patent system. It has all of the attributes normally attributed to a patent which include an application setting forth claims, protection granted by the Government for a limited time, a right of action in the inventor to protect the invention against infringement, notice to the public in an official publication, and availability to the public of the specifications and claims. Furthermore, the Gebrauchsmuster falls within the general definition of "patent" in that it does command a sovereign grant of right of exclusive use for limited periods. Finally, the United States Patent Office has long treated it as a patent, granting it full rights of priority, with there being no statutory or Constitutional policy which would deny a lesser form of patent the force of a regular patent. We are, therefore, of the opinion that the Gebrauchsmuster No. 1,660,844 obtained by Schwank prior to his United States application on an application filed more than twelve months before the United States filing is a patent within the meaning of the patent law and as such is a statutory bar to the validity of patent '830 under 35 U.S.C. § 102(d).

Defendants have also argued the patent's invalidity due to want of invention (35 U.S.C. § 103), absence of proper oath (35 U.S.C. § 115), and lack of definiteness in description (35 U.S.C. § 112). We are of the opinion that none of these arguments possess substantial merit. Our above holding, however, renders these questions moot and consequently they will not be discussed further.

## '830 Infringement

■ Since we have held patent '830 to be invalid because of 35 U.S.C. § 102(d) any discussion of infringement is normally unnecessary because there can be no infringement of an invalid patent. Nonetheless, we would like to make a brief observation on this point. We believe that the trial court's finding of no infringement was proper. Though the Lambert burner manufactured by defendants is visibly similar to plaintiffs' structure, the depth of defendants' device

is greater than the diameter of the mixing tube. Inventor Schwank, however, conditioned each of his claims on the "depth of the said dish-shaped body member between said wall and said flat fuel-outlet burner means being not substantially greater than the diameter of the said mixing tube. * * * " After being denied a patent by the Examiner, Schwank appealed to the Board of Appeals emphasizing this particular dimensional characteristic. The Board was favorably impressed and primarily on the basis of this dimensional achievement the patent was granted. Therefore, plaintiffs having been granted a patent in a very crowded field of art on the very narrow ground of dimensional variation are not in an equitable position to object when another party substantially varies these dimensions. Smith v. Mid-Continent Inv. Co., 106 F.2d 622 (8 Cir. 1939). A person having a valid patent only by virtue of narrowly limited and strictly construed claims cannot expect the courts to construe a broad interpretation of the patent in order to find infringement. Dominion Magnesium Limited v. United States, 320 F.2d 388, 162 Ct.Cl. 240 (1963); Industrial Instrument Corporation v. Foxboro Company, 307 F.2d 783 (5 Cir. 1962). Under the circumstances of this case we believe that even if the patent were valid, plaintiffs have not borne their burden of proving infringement.

### Anti-Trust Counterclaim

As a counterclaim for affirmative relief defendants have alleged that the licensing agreement between plaintiffs, American Infra-Red and Hupp Corporation, is a violation of the anti-trust law entitling them to treble damages.

We observe from the record that American Infra-Red, as the assignee of the inventor, granted to Hupp Corporation a so-called nonexclusive license to manufacture and sell radiant gas burners within the claims and specifications of patent '830. With the granting of this license Hupp agreed to purchase all of the tile (patent '294) that was resold to third parties or used in the manufacture of the burner from American Infra-Red.[7] Since there was no apparent payment for the license nor any agreement to pay royalties it would seem that the consideration for the license was Hupp's agreement to purchase all the necessary tile exclusively from American Infra-Red. This agreement, then, has the appearance of an exclusive dealing contract which was "tied", as a condition, to the issuance of the license. It is well known that exclusive dealing contracts, especially when tied to the lease or sale of another product, while admittedly not illegal per se, are carefully scrutinized by the courts. "When the effect of such arrangements 'may be to substantially lessen competition or tend to create a monopoly' they are made unlawful by section 3 of the Clayton Act." 2 Toulmin's Anti-Trust Laws, § 15.7 (1950).

We note, however, that proof of an isolated violation of substantive law will not entitle defendants to an affirmative recovery. Before a party is entitled to recover treble damages he must be able to plead and prove actual monetary in-

---

7. The pertinent part of the licensing agreement dated July 1, 1956 is as follows:

"American Infra-Red hereby grants and agrees to grant to Hupp the following:

"(a) A royalty free, non-exclusive license to use and/or sell said radiant plates ['294] and a royalty free, non-exclusive license to make, have made, use and/or sell said gas burning equipment ['830] (but not including the license to make or have made said radiant plates, * * *)"

Section (b) provides that Hupp has the right to make or have made the radiant plates in the event that American Infra-Red is unable to supply them in the prescribed numbers. The pertinent part of the sales agreement dated July 1, 1956 is as follows:

"Buyer agrees to purchase and Seller agrees to sell to Buyer * * * all said radiant plates required for use or replacement in radiant gas burners * * * made by or for Buyer and all said radiant plates which Buyer resells to third parties."

jury to his business or property resulting from the illegal act. 15 U.S.C., § 15; Duff v. Kansas City Star Company, 299 F.2d 320 (8 Cir. 1962). It has long been the law that damages which are purely speculative, remote, or based upon conjecture cannot serve as a base for anti-trust recovery. Siegfried v. Kansas City Star Company, 298 F.2d 1 (8 Cir. 1962). Although the mere difficulty of exact proof will not deprive a party of relief, still damages to be awarded must be susceptible of expression in figures founded upon some reasonable basis of computation. National Wrestling Alliance v. Myers, 325 F.2d 768 (8 Cir. 1963).

The trial court held, "That there has been a failure of proof required to establish any violation of either the Sherman Act * * * or the Clayton Act * * * that would permit awarding damages to Defendants. Both of these Acts require damages to be proved beyond any evidence submitted and relied upon by Defendants." Upon reviewing the evidence and the arguments in this case we are in agreement with the finding of the trial court. Defendants have, indeed, failed to produce any concrete evidence of monetary damage and as a consequence are not entitled to recovery.

As an element of damage defendants have argued that the agreement between American Infra-Red and Hupp has precluded them from selling tiles to Hupp. This allegation, however, does not serve as a basis for computing monetary loss. This mere reiteration of the substantive charge leaves the finder of fact completely at sea without any guide for effective assessment of actual injury. Defendants have produced no facts or figures as to how much business was lost due to being precluded from this part of the market or how many tiles they would have sold to Hupp had it not been for this agreement. The finding of monetary damage, under the circumstances, would have to be purely speculative and without evidentiary support in the record. Some-

thing more definite than this must be produced to show actual injury to defendants' business or property.

As a second point defendants allege that the expense of defending the patent infringement segment of this litigation could serve as a basis for awarding treble damages and cite three cases in support of this theory. Clapper v. Original Tractor Cab Company, 270 F.2d 616 (7 Cir. 1959); Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416 (10 Cir. 1952); Dairy Foods, Incorporated v. Dairy Maid Products Cooperative, 297 F.2d 805 (7 Cir. 1961).

In examining this contention we see that the statute, which affords the private cause of action, clearly requires a causal connection between the "injury in his business or property" and the anti-trust violation. 15 U.S.C. § 15;[8] Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., 268 F.2d 246 (2 Cir. 1959) cert. denied 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed. 2d 121. It follows, therefrom, that the expense of defending a patent infringement suit could not be considered as a per se element in determining treble damages in an anti-trust counterclaim. As stated in the Kobe case, supra, cited by defendants in 198 F.2d at p. 425, "[I]f there was nothing more than the bringing of the infringement action, resulting damages could not be recovered. * *." In order, therefore to recover damages the law requires there be a showing of a causal connection between the infringement suit and the anti-trust activities. Upon a showing that the infringement litigation was initiated as part of the illegal scheme, it is conceivable that its defense could be considered as an "injury" under the anti-trust statutes. This, in fact, is exactly what defendants' cases say. Patent litigation expense may only be considered in anti-trust counterclaims, "Where an infringement suit is brought as part of and in furtherance of a combination and conspiracy * * *."

---

8. 15 U.S.C. § 15 provides in part: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue * *."

Dairy Foods, Incorporated v. Dairy Maid Products Cooperative, 297 F.2d 805, 809 (7 Cir. 1961). Therefore, whenever the patent litigation is initiated pursuant to a lawful purpose and there is no causal connection between the bringing of the action and the illegal conduct, the cost of the defense of the suit cannot become an element of damage which is tripled under the Clayton Act. See, Malta Manufacturing Company v. Osten, 215 F.Supp. 114 (E.D.Mich.1963).

Applying this law to the facts of this case, there is no indication that the initiation of this suit was inspired by any monopolistic conspiracy or was a veiled attempt to unjustly drive plaintiffs' competitors to the wall. In fact, all indications point out that this suit was brought with clean hands in a good faith attempt to protect plaintiffs' patent rights, which they were fully entitled to do under the patent law. Indeed, the trial court specifically found that plaintiffs had been guilty of no patent misuse in the initiation of this suit. Further, it is our belief that this litigation was not precipitated by any monopolistic activity, but rather the dispute over the validity and infringement of these patents would have existed regardless of the particulars of the licensing agreement between the individual plaintiffs. The defense of this suit is, therefore, an expense attributable, not to the allegedly illegal contracts but solely to a dispute over the two patents. There being no proof of any causal connection between the patent litigation and the allegedly illegal contracts, and it not being shown that the suit was initiated in furtherance of any monopolistic scheme or conspiracy, we believe that defendants have failed to prove these litigation expenses are anti-trust damages.

In addition we recognize the fact there is authority that no patent litigation expense may be recovered as treble damages in an anti-trust counterclaim. The leading case taking this approach is Straus v. Victor Talking Machine Co., 297 F. 791 (2 Cir. 1924) and cited with approval by Malta Manufacturing Company v. Osten, 215 F.Supp. 114 (E.D.Mich.1963).

The rationale of these cases is that allowance of such a recovery would inhibit free resort to the courts.

Although we do recognize the abstract possibility that the contractual arrangements of plaintiffs, in their totality, might come into conflict with provisions of the anti-trust law, we have based our decision herein solely upon the trial court's finding of no damages. We affirm judgment of the trial court on the basis that the ruling was not clearly erroneous. In no way is our decision to be interpreted as indicating whether we believe there has been a substantive violation of the anti-trust law. On this basis the judgment of the trial court on this issue is affirmed.

### Costs

The trial court ruled that each party was to bear his own costs and disbursements. In view of the outcome of this appeal it is our conclusion that this division of costs should be modified.

Neither party has prevailed in his claim for affirmative relief. We have held both of plaintiffs' patents invalid, and even if not invalid aside from the statutory bar patent '830 could not be considered infringed upon. Defendants, on the other hand, have wholly failed to prove damages which would entitle them to recover on the anti-trust counterclaim. In this connection we observe that the bulk of this litigation was devoted to the patents, their validity and infringement, with only a minority of the courts' and parties' time being directed to the anti-trust allegations. We believe, therefore, that three-fourths of the cost of printing 30 copies of the record shall be borne by and assessed against plaintiffs, who initiated the patent litigation, and the remaining one-fourth of said cost shall be borne by and assessed against defendants, who are responsible for the anti-trust litigation.

Plaintiffs' appeal No. 18054 seeks reversal of the portion of the District Court's judgment finding no infringement upon the patents. Since we have held that U.S. Patents No. 2775294 and

**998**

No. 2870830 are invalid and an invalid patent cannot be infringed, the awarding of judgment to defendants-appellees on the patent infringement action is affirmed.

Defendants' appeal No. 18055 seeks reversal of the portions of the District Court's judgment holding the two patents to be valid and denying relief on the antitrust counterclaim. For the reasons set out herein the District Court's determination of validity is reversed and its denial of relief on the counterclaim is affirmed.

Therefore, on the patent infringement suit judgment shall be entered in favor of defendants-appellants on the basis that the patents in question are invalid. On the anti-trust counterclaim judgment shall be entered in accordance with the judgment of the District Court in favor of plaintiffs-appellees on the basis of failure of proof on damages.

Affirmed in part. Reversed in part.